**UNITED STATES of America, Plaintiff,**

v.

**Deondre HAMMONDS, Defendant.**

**Cr. No. 91–CR–80130–DT.**

United States District Court,
E.D. Michigan, S.D.

Feb. 28, 1992.

Kenneth Chadwell, U.S. Atty., Detroit, Mich., for U.S.

Miriam Seifer, Federal Defenders Office, Detroit, Mich., for defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT

ROSEN, District Judge.

### I. INTRODUCTION

This criminal action is presently before the Court on Defendant Deondre Hammonds' Motion to Dismiss his one-count indictment for failure to state a crime. Hammonds contends that, based upon recent federal decisions construing the interplay between federal and state firearms laws, his 1984 Michigan state court conviction for "larceny from the person" cannot be used as a basis for charging him as a felon-in-possession of an firearm in violation of 18 U.S.C. § 922, which is the only crime charged in the indictment.

The Government filed a Response and Brief in Opposition to Hammonds' Motion on November 15, 1991, to which Response Defendant replied on November 21, 1991. The parties' attorneys then presented oral arguments on Defendant's Motion at a hearing held on December 5, 1991. Following the hearing, Defendant submitted to the Court a "Post Oral Argument Memorandum" in further support of his arguments for dismissal of his Indictment.

The Court has reviewed and considered all of the Briefs submitted by Defendant and by the Government, and having further considered the December 5, 1991 oral arguments of counsel, the Court is now prepared to rule on Defendant's Motion. This Opinion and Order sets forth that ruling.

### II. FACTUAL BACKGROUND

#### A. THE INDICTMENT AT ISSUE

On March 12, 1991, the Grand Jury issued a one-count indictment against Defendant Deondre Hammonds. The indictment charges that on February 8, 1991, Hammonds—who previously had been convicted of a felony punishable by a term of imprisonment of more than one year—was in possession of a 12–gauge pump-action shotgun in violation of 18 U.S.C. § 922(g)(1).

#### B. HAMMONDS' PREVIOUS FELONY CONVICTION

As indicated in the indictment, Hammonds had been previously convicted of a felony.

On May 10, 1984, Hammonds was convicted in Detroit Recorder's Court for "larceny from the person", which under Michigan law, is a felony punishable by a term of imprisonment of up to ten years. On that same date, May 10, 1984, Hammonds was sentenced by the state court to two years probation. As part of that two-year sentence of probation, Hammonds was ordered confined for 60 days in the Detroit House of Corrections.

On May 8, 1986, the Recorder's Court sentencing judge entered an "Order of Probation Discharge", terminating Defendant's probation, discharging him from probation supervision, and closing the case.

#### C. EVENTS GIVING RISE TO HAMMONDS' INDICTMENT

On February 8, 1991—four years and nine months after Hammonds was discharged from his probation sentence—Wayne County Sheriff Deputies and Federal Alcohol, Tobacco and Firearm Agents executed a state search warrant at 14432 Young Street, Detroit, Michigan. Deondre Hammonds resided at that address at the time of the search. During the search, the Agents seized a Maverick Arms 12–gauge pump-action shotgun from the living room closet of the Young Street house. Hammonds was questioned and gave a statement with respect to the shotgun. Apparently, as a result of Hammonds' statement,[1] ATF Agent Donald Dawkins swore out a complaint charging Hammonds with being a felon-in-possession of a firearm in violation of 18 U.S.C. § 922, and on March 12, 1991, the Grand Jury indicted Hammonds.

---

1. Hammonds has also filed a Motion to Suppress his statement to Agent Dawkins. It was agreed by counsel for the parties and the Court that Defendant's Motion to Dismiss Indictment should be decided before the Court heard the Motion to Suppress.

Hammonds now moves to dismiss his indictment arguing that under the Sixth Circuit's decision in *United States v. Cassidy,* 899 F.2d 543 (6th Cir.1990), the Ninth Circuit's decision in *United States v. Dahms,* 938 F.2d 131 (9th Cir.1991), and the recent decision of District Judge Paul Gadola in *United States v. Gilliam,* 778 F.Supp. 935 (E.D.Mich.1991), he is not a "person who has been convicted of a crime punishable by imprisonment for a term exceeding one year" within the meaning of 18 U.S.C. §§ 921(a)(20) and 922(g)(1), because, he contends, that by virtue of his having been discharged from the sentence of probation for his state court conviction, his "civil rights" have been restored.

### III. THE FEDERAL FELON–IN–POSSESSION STATUTE

18 U.S.C. § 922(g)(1)—the statute under which Defendant Hammonds is charged—provides as follows:

> (g) It shall be unlawful for any person—
> (1) who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 921 provides definitions for the terms used in the federal firearms statutes, including Section 922. 18 U.S.C. § 921(a)(20) defines the terms "convicted ... of a crime punishable by imprisonment for a term exceeding one year". That subsection provides, in pertinent part:

> (20) The term "crime punishable by imprisonment for a term exceeding one year" does not include—
> (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or
> (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

> *What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside, or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement or restoration of civil rights expressly provides that the person may not ship, transport, possess or receive firearms.*

18 U.S.C. § 921(a)(20) (emphasis added).

The "what constitutes a conviction" provisions of Section 921(a)(20)(B) were added in 1986. Prior to the enactment of the Federal Firearms Owners Protection Act of 1986 ("FOPA"), (which amended the pertinent provisions of the federal firearms statute under which Hammonds was indicted), 18 U.S.C. § 921(a)(20) only provided as follows:

> The term "crime punishable by imprisonment for a term exceeding one year" shall not include (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate, or (B) any State offenses (other than one involving a firearm or explosive) classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

### IV. ANALYSIS

**A. THE *CASSIDY* CASE AND THE SIXTH CIRCUIT'S DISCUSSION OF THE LEGISLATIVE HISTORY OF THE 1986 AMENDMENTS TO SECTION 921(a)(20)**

*1. The Cassidy Case*

As indicated *supra,* the Sixth Circuit authority relied upon by Hammonds in support of his Motion to Dismiss Indictment is *United States v. Cassidy,* 899 F.2d 543 (6th Cir.1990).

In that case, the defendant had been convicted in Ohio in September 1983 of marijuana trafficking, a crime which, pursuant to Ohio law, is punishable by a prison term in excess of one year. Following his conviction, Cassidy was sentenced to imprisonment. He was released from prison in June 1984, at which time he received from the Ohio Adult Parole Authority a "Restoration to Civil Rights" certificate which restored "the rights and privileges forfeited by [his] conviction; namely the right to serve on juries and to hold office of honor, trust or profit."

In January 1989, Cassidy was indicted by a federal grand jury in connection with two separate incidents involving possession of a firearm arms, in violation of 18 U.S.C. § 922(g)(1).

The District Court for the Southern District of Ohio dismissed the indictment because it determined that the Restoration Certificate given to Cassidy upon his release from prison constituted a "restoration of civil rights", under section 921(a)(20). The district court held that since the Restoration Certificate did not expressly limit Cassidy's firearms privileges, Cassidy was not a "convicted felon" under Ohio law and the federal firearms statutes.

The Sixth Circuit reversed the district court's dismissal of Cassidy's indictment. Although the appellate court found that there had been a "restoration of civil rights" in Cassidy's case because after his release from prison, Cassidy's right to vote was restored by statute [2] and his rights to serve on a jury and to seek and hold public office were restored to him by virtue of the express language of the Restoration Certificate, it also found that notwithstanding the restoration of those rights, Ohio Revised Code § 2923.13 expressly precluded Cassidy, as a person who had previously been convicted of a drug trafficking offense, from possessing a firearm.[3] Thus, the Court of Appeals determined that under the provisions of 18 U.S.C. § 921(a)(20), Cassidy was a person who had been convicted of a "crime punishable by imprisonment for a term exceeding one year".

2. *The Cassidy Court's Construction of the Legislative History of § 921(a)(20) and the Exemption of "Any Conviction for Which a Person Has Had Civil Rights Restored".*

In reaching its conclusion, the *Cassidy* court examined the legislative history of the Firearms Owners' Protection Act of 1986, which added the "what constitutes a conviction" and "restoration of civil rights" provisions to 18 U.S.C. § 921(a)(20). These provisions had their genesis in a bill entitled the "Federal Firearms Law Reform Act of 1979", which was introduced in the Senate by Senator McClure on October 5, 1979 as Senate Bill 1862 (referred to herein and in *Cassidy* as "S. 1862").

The *Cassidy* court explained the legislative history of the 1986 amendments of Section 921(a)(20) as follows:

In S. 1862, persons were to be subject to firearms disabilities if they had been "convicted in any court of a disabling crime." *See* 125 Cong.Rec. 27, 383. The bill defined "disabling crime" as

a violation of chapters 5, 7, 12, 35, 37, 39, 42, 49, 51, 55, 68, 77, 81, 84, 95, 96, 99, 102, 103, 105, 113, 115 and 117 of title 18, attempts at violations of the aforementioned chapters, or any similar crime punishable in a court, except a State offense classified by the law of a State as a misdemeanor and punishable by a term of imprisonment of two years or less. *Any conviction which has been expunged or set aside shall*

---

**2.** Ohio Rev.Code § 2961.01 automatically restores a convicted felon's right to vote automatically upon his release from prison.

**3.** Ohio Rev.Code § 2923.13 provides that
(A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry,

or use any firearm or dangerous ordinance if
. . .
(2) Such person is under indictment or has been convicted of any felony of violence [or]
(3) Such person is under indictment or has been convicted of any offense involving illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

*not be considered a conviction for the purposes of this chapter.*

*Id.* In a subsequent version, S. 1030, the sponsors of FOPA abandoned this approach and attempted instead to define "crime punishable by imprisonment for a term exceeding one year." *See* S. 1030 97th Cong., 1st Sess. (1981).

The first version of S. 1030 defined "convicted felon" as follows:

The term "crime punishable by imprisonment for a term exceeding one year" shall not include (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two year or less: *Provided, however, that what constitutes a conviction shall be determined in accordance with the law of the jurisdiction in which the proceedings were held: Provided further, That any conviction which has been expunged or set aside or for which a person has been pardoned or has had his or her civil rights restored shall not be considered a conviction under the provisions of this Act.*

*Id.* A subsequent version of S. 1030 added the phrase *"unless such pardon, expungement, or restoration of civil rights expressly provided that the person may not ship, transport, possess, or receive firearms"* to the end of the definition. S.Rep. No. 97–476, 97th Cong., 2d Sess. 4 (1982).

The reason for this addition was explained in the Senate Judiciary Committee Report accompanying the revised version of S. 1030:

The original language of S. 1030 provided that a person barred from gun ownership by a conviction would be relieved from that bar if he received a pardon or restoration of civil rights.

The amended bill adds the exception that this will not apply if the pardon or restoration expressly provides that the recipient may not own firearms. *This allows flexibility should such a pardon or restoration be based upon considerations not relating to fitness to own a firearm.*

*Id.* at 12. The Judiciary Committee report also explained why the definition of "convicted felon" in existing law needed revision:

S. 1030 works two changes to this subsection. The first is a recognition that what constitutes a conviction shall be determined in accord with the law of the jurisdiction where the underlying proceedings were held. This is intended to accommodate state reforms adopted since 1968, which permit dismissal of charges after a plea and successful completion of a probationary period, or which create 'open-ended' offenses, a conviction for which may be treated as a misdemeanor or felony at the option of the court. Since the federal prohibition is keyed to the state's conviction, state law should govern these matters. In the case of 'open-ended' offenses which are classed as felonies but may be reduced by the trial court, it is intended that these constitute a 'crime punishable by imprisonment for a term exceeding one year' unless and until the court enters a decision to treat the offense as a misdemeanor.

S. 1030 would also exclude from such convictions any *for which the person has received a pardon, civil rights restoration or expungement of the record.* Existing law incorporates a similar provision as to pardons in 18 U.S.C. section 1202, relating to possession of firearms,[4] but through oversight does not include such provision in 18 U.S.C. section 922, dealing with their purchase or receipt. This oversight has resulted in a ruling that a

**4.** Under the FOPA amendments, section 922 incorporated the provisions of previous section 1202.

state pardon does not permit a pardoned citizen to receive or purchase a firearm, despite the express provision that he may possess it.... This change would remove that anomaly. *In the event that the official granting the pardon, restoration of rights or expungement of record does not desire it to restore the right to firearm ownership, this provision is rendered inapplicable where the order or pardon expressly provides that the person may not possess firearms.*

*Id.*

899 F.2d at 547–548 (footnotes omitted and emphasis added).

Based on this recitation of the legislative history of § 921(a)(20), the *Cassidy* court concluded that "a primary concern of Congress was that 'convicted felon' status be determined with reference to state law." 899 F.2d at 548.

The *Cassidy* court further concluded that the last sentence of Judiciary Committee report quoted above "suggests that legislators had in mind the simple example where an ex-convict is handed a pardon or expunction order by a state official." *Id.*

Despite the Sixth Circuit's observation that the language of the Judiciary Committee's report suggested that Congress intended that the addition of "unless such pardon, expungement or restoration of civil rights expressly provided that the person may not ship, transport, possess or receive firearms" would come into play only where a written pardon or restoration of civil rights certificate was issued, the court went on to hold—without any specific reference to the legislative history—that "[i]t would frustrate the intent of Congress, however, to focus solely upon the document transferred to the convict upon release."

According to the *Cassidy* court,

The intent of Congress was to give effect to the state reforms with respect to the status of an ex-convict. A narrow interpretation requiring that we look only to the document, if any, evidencing a restoration of rights, would frustrate the intent of Congress that we look to the

whole of state law, including state law concerning a convicted felon's firearms privileges. *The last sentence from the above quote from page 12 of Senate Report 97–476 suggests that Congress did not intend that a "convicted felon" be restored to federal firearms privileges if the restoration was "based upon considerations not relating to fitness to own a firearm."*

899 F.2d at 548 (emphasis added).

The *Cassidy* court then went on to quote Minnesota Senator Durenberger's post-FOPA passage statement urging delaying the effective date of FOPA in order to allow states to reexamine their civil rights restoration laws and statutes regulating possession of firearms by convicted felons. Senator Durenberger stated:

In the State of Minnesota, a convicted felon's civil rights are automatically restored when his sentence expires. Therefore, under the new federal law, it will no longer be a violation of the Federal Gun Control Act of 1968 for a Minnesotan convicted of a felony to possess a firearm after his sentence has expired. The same will be true in each State which automatically restores a convicted felon's civil rights. *This creates a problem in my State. The ironic, unintended side effect of this "glitch in the gun law" is to turn a law intended to crack down on crime into a law that could abet crime unless Minnesota changes its law regarding the civil rights of felons....*

899 F.2d at 548–549, *quoting,* 132 Cong. Rec. S14,974.

The Sixth Circuit determined that Senator Durenberger's statement "accurately portrays the effect of FOPA's deference to state law with respect to the federal firearms privileges." 899 F.2d at 549.

The *Cassidy* court then went on to analyze the term "civil rights" as used in Section 921(a)(20):

The language of the statute points out the category of "rights" that Congress intended to reach in the definition of "crime punishable by imprisonment for a term exceeding one year." The fact that

Congress used the term "civil rights", as opposed to "all rights and privileges", as the government would have us interpret the statute, indicates that Congress intended to encompass those rights accorded to an individual by virtue of his citizenship in a particular state. *These rights include the right to vote, the right to seek and hold public office and the right to serve on a jury.*

899 F.2d at 549.

The *Cassidy* court reached this conclusion in spite of the fact that it could find *nothing* in the legislative history to indicate that Congress intended that the restoration of the right to vote, to seek and hold public office, and the right to serve on a jury would *automatically* also restore to a convicted felon the right to possess a firearm: [5]

> Our review of the legislative history has not produced a precise statement from Congress identifying the rights that must be restored by a state in order for it to have effected a "restoration of civil rights" for purposes of § 921(a)(20). We are confident, however, based on the general intent of Congress to redirect enforcement efforts against firearms owners that have a demonstrated potential for serious unlawful activity, that Congress envisioned a restoration of more than a *de minimis* quantity of civil rights.

*Id.*

However, the *Cassidy* court expressly declined to find that a "full" restoration of civil rights what was Congress intended by the "restoration of civil rights" provision of Section 921(a)(20):

> We do not read into the statutory language, however, a requirement that there be a "full" restoration of rights. If Congress had intended a requirement of a complete restoration of all rights and privileges forfeited upon conviction, it could have easily so stated.

*Id.*

Thus, based upon the foregoing interpretation of the legislative history of the 1986 Firearms Owners Protection Act, the Sixth Circuit held that because Cassidy's right to vote, to seek and hold public office, and to serve on a jury had been restored to him under Ohio law, Cassidy did have a "restoration of civil rights" as contemplated by 18 U.S.C. § 921(a)(20). 899 F.2d at 550. However, because the court also found that Cassidy, having been convicted of a drug trafficking crime, was expressly restricted under Ohio law from possessing a firearm, under § 921(a)(20)(B), he was, nonetheless, a person who had been convicted of a "crime punishable by imprisonment for a term exceeding one year" for purposes of the federal firearms statutes. *Id.*

## B. THE DAHMS AND GILLIAM DECISIONS

As indicated above, in support of his arguments for dismissal of his indictment,

---

**5.** The government had argued in *Cassidy* that a convicted felon cannot have a restoration of rights without a restoration of his state firearms "rights". The *Cassidy* court rejected this argument. 899 F.2d at 549, n. 12. In so doing, the court relied upon its own determination in *United States v. Warin,* 530 F.2d 103, 106 (6th Cir. 1976), *cert. denied,* 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976), that under the Second Amendment, there is no individual right to possess a firearm. However, throughout the seven-years that Congress dealt with the amendments to the Gun Control Act that are presently at issue, in enacting the 1986 amendments the Legislature approached this matter with clearly stated belief that there is a constitutionally protected individual "right" to possess firearms.

In fact, Congress expressly so stated in the Federal Firearms Owners Protection Act of 1986—which legislation included the amendments 18 U.S.C. Sec. 921(a)(20) which are at issue here. The Act contains an express prefatory statement of "Congressional Finding and Declaration", which provides, in pertinent part, "The Congress finds that the rights of citizens to keep and bear arms under the second amendment to the United States Constitution ... require additional legislation to correct existing firearms statutes and enforcement policies." Pub.L. 99–308, § 1(b) (1986). *See* 18 U.S.C.A. § 921, Historical and Statutory Notes (West Supp.1991) p. 58.

Although this expression is not, of course, dispositive of the issue of whether there is a Constitutional right, the fact that key legislators and the Act itself expressed the belief that such a "right" exists is reflective upon the context of the debate and consideration of this legislation, and, of course, Congressional intent.

in addition to *Cassidy,* Defendant also relies on the Ninth Circuit's decision in *United States v. Dahms,* 938 F.2d 131 (9th Cir.1991) and the decision of Judge Gadola in *United States v. Gilliam,* 778 F.Supp. 935 (E.D.Mich.1991).

### 1. *The Dahms Case*

*Dahms* was the first reported case to in which a court has been called upon to apply § 921(a)(20) to a former convicted felon who had been convicted and sentenced in Michigan.

In 1975, Michael Dahms pled guilty in a Michigan state court to a charge of "assault with attempt to rob while armed" and was sentenced to prison. He was released on parole in August 1981, and released from his parole in April 1983.

In June 1989, while in Montana, Dahms was involved in an aggravated assault, using one of his two shotguns. He was charged with assault in Montana state court, and he was also charged in federal court with being a felon in possession of a firearm under the federal felon-in-possession statute. Dahms moved to dismiss his federal indictment, but that motion was denied. He then entered a conditional guilty plea.

Dahms subsequently appealed his conviction, arguing that his indictment should have been dismissed because he was not a previously convicted felon under Section 921(a)(20). The Ninth Circuit agreed with him and reversed his conviction.

In reaching its decision, the *Dahms* court followed the Sixth Circuit's ruling in *Cassidy,* that in determining whether a person is a previously convicted felon under Section 921(a)(20) a court is to look to the law of the state in which the defendant was originally convicted. Since Dahms had originally been convicted in Michigan, the Ninth Circuit examined Michigan law.

Dahms argued—as does Defendant Hammonds in this case—that even though Michigan does not have a "restoration of civil rights" statute, his civil rights had been restored within the meaning of Section 921(a)(20) because, under Michigan law, he had the right to vote, to hold public office

and to serve on a jury. The government argued that the absence of a restoration of rights statute in Michigan indicates that his rights had not been restored for purposes of the federal felon-in-possession statute.

Noting that no case in the Ninth Circuit had previously addressed the question of whether, absent a general restoration statute, restoration of the rights to vote, to hold public office and to serve on a jury was sufficient to constitute a substantial "restoration of civil rights" for purposes of the federal firearms statutes, the *Dahms* court looked to the Sixth Circuit's decision in *Cassidy* and found the Sixth Circuit decision to be persuasive. The *Dahms* court stated:

> After careful review of the legislative history of § 921(a)(20), the Sixth Circuit in *Cassidy* declared that
>
> > Congress intended to encompass those rights accorded to an individual by virtue of his citizenship in a particular state. These rights include the right to vote, to seek and hold public office and the right to serve on a jury.
>
> *Cassidy,* 899 F.2d at 549. We find this reasoning persuasive and hold that a convicted felon who, having first lost them upon conviction, regains the rights to vote, to sit on a jury and to hold public office in the state in which he was originally convicted has had his civil rights substantially restored under § 921(a)(20).

938 F.2d at 133.

Although the *Dahms* court noted the Sixth Circuit's review of the legislative history of § 921(a)(20), it does not appear from the text of the *Dahms* opinion that the Ninth Circuit independently reviewed the legislative history.

By application of *Cassidy,* the Ninth Circuit found that, notwithstanding the absence of a restoration of civil rights statute, under "the whole of [Michigan] law", Dahms' rights to vote, to hold public office, and to serve on a jury had been restored. The *Dahms* court then went on to hold that under Michigan law "[o]nce incarceration has ended ... these rights are restored *automatically* by the force of the very

laws that suspend them." 938 F.2d at 134 (emphasis added).[6]

The Ninth Circuit, then went on to address—and reject—the government's argument that, because Michigan law restricted Dahms' right to possess a pistol, he was subject to conviction under the federal firearms statute for possessing a shotgun. The court found that because Michigan's firearms licensing and concealment statute, M.C.L. § 28.422, only restricts a prior convicted felon's right to possess and carry a pistol, it "[could] not say that Michigan intended to restrict a felon's ability to possess all types of firearms." 938 F.2d at 135.

Therefore, the court concluded that the district court had erred in not dismissing Dahms' indictment and, accordingly, reversed Dahms' conviction.

## 2. *The Gilliam Case*

In *United States v. Gilliam*, 778 F.Supp. 935 (E.D.Mich.1991), the defendant had been convicted and sentenced to imprisonment in 1978 in Michigan state court for first degree criminal sexual conduct. He was released from prison in 1982.

Gilliam was subsequently charged in a one count felon-in-possession indictment, which alleged that in December 1990, he possessed a .22 calibre semi-automatic rifle in violation of the federal firearms laws. He moved to dismiss his indictment arguing that his prior state law conviction fell within the exception clause of 18 U.S.C. § 921(a)(20).

Relying principally upon *Cassidy* and *Dahms*, Judge Gadola granted Gilliam's motion.

Judge Gadola determined that, by application of *Cassidy* and operation of the provisions of M.C.L. §§ 168.758b, 168.938, and 600.1307a, Gilliam's rights to vote, to hold public office, and to serve on a jury had been restored. Therefore, he found that Gilliam's "civil rights as defined by the Sixth Circuit in *Cassidy*" had been restored. 778 F.Supp. at 937.

The court then went on to discuss—as the *Dahms* court did—the effect of Michigan's licensing and concealment statute, M.C.L. § 28.422. And, "find[ing] the *Dahms* reasoning compelling," the court determined that Michigan law only restricts the right of felons to possess pistols, not shotguns or rifles. *Id.* at 939.

Therefore, the court dismissed Gilliam's indictment. *Id.* at 941. In so doing, Judge Gadola opined that "by allowing the Federal Gun Control Act's potency to turn upon the varying states laws, Congress has regrettably emasculated the Act in the state of Michigan." *Id.* at 940. He then went on to cite Senator Durenberger's post-FOPA enactment statement—which the *Cassidy* court also quoted at 899 F.2d at 548–549—regarding what he viewed as the "unintended side effect" of the 1986 amendment of Section 921(a)(20) with respect to state laws which operate to "auto-

---

**6.** As the *Dahms* court observed, several Michigan statutes operate to suspend a person's rights to vote, to hold public office and to serve on a jury. The specific statutes examined by the Ninth Circuit were M.C.L. §§ 168.758b, 168.938, and 600.1307a. 938 F.2d at 134–135, n. 1–3.

M.C.L. § 168.758b provides:
A person who, in a court of this or another state or in federal court, has been legally convicted and sentenced for a crime for which the penalty imposed is confinement in jail or prison shall not vote, offer to vote, attempt to vote, or be permitted to vote at any election while confined.

M.C.L. § 168.938 provides:
In any candidate for any public office at any election in this state shall be convicted of a felony, as defined in this act, the election of such candidate, if he has been elected, shall

be void; and if he shall enter into the office for which he was elected, an information in the nature of a quo warranto to oust him from such office may be filed in the supreme court or in the proper circuit court.

M.C.L. § 600.1307a provides, in pertinent part:
To qualify as a juror, a person shall ... [n]ot be under a sentence for a felony at the time of jury selection.

The Court notes that to the extent that the *Dahms* court determined that the rights to hold public office and to serve on a jury are automatically restored "[o]nce incarceration has ended", this determination is not an accurate construction of M.C.L. §§ 168.938 and 600.1307a. Rather, as the plain language of both of those statutes indicate, the end of incarceration does not end the suspension of those rights.

matically" restore a convicted felon's rights to vote, to hold public office and to serve on a jury. *Id.*

This is the only "legislative history" cited in the *Gilliam* opinion.

## C. THIS COURT'S CONSTRUCTION OF *CASSIDY* AND THE LEGISLATIVE HISTORY

This Court has carefully reviewed the *Cassidy* decision and its progeny, and has independently reviewed the legislative history of the 1986 amendments to § 921(a)(20). Based upon that review, this Court finds that the *Cassidy* court's interpretation of the restoration of civil rights provision of § 921(a)(20), as it operates in conjunction with Ohio substantive law relating to firearms ownership, is not a complete analysis of the intent of Congress in enacting the amendments to § 921(a)(20) as evidenced by the full legislative history of the Federal Firearms Owners Protection Act of 1986, as that intent relates to states—such as Michigan—which do not have a separate and distinct state action granting restoration, such as a specific restoration certificate, or even a separate statute.

Specifically, this Court finds that the legislative history discussed in the *Cassidy* decision itself reflects that Congress intended that the second sentence of § 921(a)(20)—i.e., the provision that "any conviction that has been expunged, or set aside or for which a person has been pardoned or has had his civil rights restored shall not be considered a conviction for purposes of this chapter unless such pardon, expungement, or restoration of civil rights express provides that the person may not ship, transport, possess or receive firearms"—*only* would come into play in cases where the defendant has been issued a written document by a state official, such as a "Restoration of Civil Rights Certificate" (as was the case in *Cassidy* ), or

where there is some other "affirmative", considered action.[7]

The legislative history discussed in *Cassidy* clearly reflects that Congress contemplated that the "restoration of civil rights" exemption of § 921(a)(20) would only be triggered in those situations in which there had been some showing that the state action restoring "civil rights" was taken after at least some consideration had been given to the individual's fitness to own a firearm.

The *Cassidy* court itself acknowledged as much by stating that in enacting the second sentence of § 921(a)(20)(B), Congress had in mind the simple example "where an ex-convict is handed a pardon or expunction order by a state official." 899 F.2d at 548. Indeed, the *Cassidy* court specifically stated that "Congress did not intend that a 'convicted felon' be restored to federal firearms privileges if the restoration [of civil rights] was based upon considerations not relating to fitness to own a firearm," *Id.* The court even went on to state that it was "confident ... based upon the general intent of Congress to redirect enforcement efforts against firearms owners that have a demonstrated potential for serious unlawful activity, that Congress envisioned a restoration of more than a *de minimis* quantity of civil rights." *Id.* at 549.

In this Court's view, the confusion began when the *Cassidy* court went on to imply, despite its own stated understanding of Congressional intent, that an ex-convict had his civil rights restored sufficient to own a firearm if, under state law, his rights "to vote, hold public office and to serve on a jury" are restored. *Id.* Even here, however, the *Cassidy* court did not indicate that restoration of those rights was, itself, sufficient to satisfy the federal statute to permit firearm ownership. Rather, the court indicated that even where these rights are restored, it would also look to state law to determine "whether the 'convicted felon' is entitled to exercise the

---

**7.** The Senate Judiciary Committee Report on S. 1030 cited in *Cassidy* specifically states: "In the event that *the official* granting the pardon, restoration of rights or expungement of record does not desire it to restore the right to firearm

ownership, this provision is rendered inapplicable where the *order* or *pardon* expressly provides that the person may not possess firearms." 899 F.2d at 548, *quoting* S.Rep. No. 97–476, 97th Cong., 2d Sess. at p. 12.

privileges of shipping, transporting or receiving a firearm." *Id.*

The problem is that, despite the *Cassidy* court's acknowledgement that the federal statute does not contemplate automatic restoration of the right to firearm ownership if a convict's restoration of his civil rights "was based upon considerations not related to fitness to own a firearm", *id.* at 548, the effect of its holding as to what constitutes a restoration of rights in states like Michigan, which do not have a specific restoration of rights statute or a certification process, is to equate the restoration of the "benevolent" rights of citizenship with the "right" of a convicted felon to own or possess a firearm—where there has been no specific consideration given by any state official to that question.

This Court does not believe the *Cassidy* court intended that result, nor did Congress. For the reasons discussed below, this Court finds that the restoration to a convicted felon of these "benevolent" civil rights, rests on considerations wholly *un* related to "fitness to own firearms", and, therefore, because of the stated intent of Congress, restoration of these rights does *not* automatically trigger a restoration of firearms privileges.

As noted above, the *Cassidy* court observed that Congress did not identify which rights must be restored to effectuate a "restoration of civil rights" under § 921(a)(20), and declined to find that, by that phrase Congress meant a "full" restoration of rights. However, in the *Cassidy* analysis of the legislative history of the 1986 legislation, there is no discussion whatsoever of what was said during the floor debates on Senate Bill S 49, which was the bill that ultimately was enacted as the Firearms Owners Protection Act of 1986. A review of the floor debate statements indicate that Congress did intend that "restoration of civil rights" mean a *full* restoration of rights.

1. *The Legislative History of the 1986 Amendments Establishes that Congress Intended that the Exemption from Convicted Felon Status for "Restoration of Civil Rights" Would Only Come Into Play When There Is a Written Document Issued Restoring Civil Rights, or Some Other Affirmative Action by a State "Official."*

 As part of its analysis of the legislative history of the 1986 legislation, the *Cassidy* court discussed Senate Judiciary Committee Report No. 97–476 on Senate Bill S. 1030, which was the second version of the Firearm Owners Protection Act, introduced in the Senate in 1981. [*See* 127 CONG. REC. 7729.][8] It was in the Senate Judiciary Committee's proposed substitute to S. 1030 that the provisions of § 921(a)(20) at issue in this case first appeared.[9] The *Cassidy* court discussed the reasons given by the Judiciary Committee in its Report for its proposed substitute to S. 1030's amendments of § 921(a)(20), and observed that the Committee's explanation in S.Rep. No. 97–476 of the purpose of the addition of the "unless such pardon, expungement, or restoration of civil rights expressly provided that the person may not ship, transport, possess, or receive firearms" language was to render the pardon/expungement/restoration of civil rights exemption inapplicable "[i]n the event that the official granting the pardon, restoration of rights or expungement of record does not desire it to restore the right to firearm ownership". 899 F.2d at 548. The *Cassidy* court concluded that this explanation "suggests that legislators had in mind the simple example *where an ex-convict is handed a pardon or expunction order by a state official.*" *Id.* (emphasis added). Nonetheless, the court went on to determine that it makes no difference for purposes of the provisions of § 921(a)(20), whether or not the restoration of civil rights is provided in a doc-

---

**8.** As noted, *supra,* the first legislation on this matter was introduced in 1979. [*See* 125 CONG. REC. 27383–27384, 27409.]

**9.** S. 1030, as introduced on April 29, 1981 did not contain the last part of § 921(a)(20), i.e., the

"unless such pardon, expungement, or restoration of civil rights expressly provided that the person may not ship, transport, possess, or receive firearms" language.

ument evidencing that event or whether the restoration occurs by operation of a state statute.

This Court believes that to accurately reflect Congress' intent, the more logical construction of Section 921(a)(20) is that the second sentence of § 921(a)(20)—i.e., the provision that "any conviction which has been expunged, or set aside or for which a person has been pardoned or has had his civil rights restored shall not be considered a conviction for purposes of this chapter unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess or receive firearms"—*only* comes into play in cases in which some official state *action* granted a convicted felon a specific pardon, expungement or restoration of rights, such as a Restoration of Civil Rights Certificate, as was the case with the defendant in *Cassidy.*

As the Seventh Circuit observed in *United States v. Erwin,* 902 F.2d 510 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 161, 112 L.Ed.2d 127 (1990),

> *When state law deems a person convicted, that is dispositive for federal purposes under the first sentence of § 921(a)(20). The second sentence does not require a federal court to disregard the state's definition of conviction just because the state has restored any one civil right.* The notice rule is designed not for statutes such as [Ill.Rev.Stat. ch. 38] para. 1005–5–5 [10] that return the right to vote and cut hair, but for communications that seem to have broader import. If, for example, the governor

issues a pardon that by virtue of state law does not restore the right to carry guns, then unless the state tells the felon this, the federal government will not treat him as convicted. *The second sentence of § 921(a)(20) is an anti-mouse-trapping rule. If the state sends the felon a piece of paper implying that he is no longer "convicted" and that all civil rights have been restored, a reservation in a corner of the state's penal code can not be the basis of a federal prosecution.* A state must tell the felon point blank that weapons are not kosher. The final sentence of § 921(a)(20) can not logically mean that the state may dole out an apparently-unconditional restoration of rights yet be silent so long as any musty statute withholds the right to carry guns. Then the state never would need to say a peep about guns; the statute would self-destruct. It must mean, therefore, that the state sometimes must tell the felon that under state law he is not entitled to carry guns, else § 922 does not apply. To the extent *Cassidy* suggests otherwise, at 545 n. 5, we have our doubts, although the question need not be resolved today. *When, however, the state sends no document granting pardon or restoring rights, there is no potential for deception, and the question becomes whether the particular civil right to carry guns has been restored by law.*

\* \* \* \* \* \*

*The last clause of § 921(a)(20) deals not with the arrangement of a state's statutes* [11] *but with misleading omissions in pardons, notices of expungement*

---

**10.** Ill.Rev.Stat. ch. 38, para. 1005–5–5 automatically restores a convicted felon's right to vote upon his release from imprisonment and restores his right to hold public office upon completion of his sentence. That statute also restores "all license rights and privileges granted under the authority of the State" (such as a license to be a barber) "unless the authority having jurisdiction of such license rights finds ... that restoration is not in the public interest."

**11.** One of defendant Erwin's argument was that because one statute, 1005–5–5 restored his rights

to vote and hold public office, but did not expressly provide that he could not "ship, transport, possess, or receive firearms", he was not a convicted felon under the federal firearms statutes. However, Illinois did, and does, by statute prohibit convicted felons from possessing firearms, Ill.Rev.Stat. ch. 38 para. 24–1.1. His argument was essentially that to be deemed a convicted felon under § 921(a)(20), Illinois would have had to have so arranged its penal code so that the provisions of 24–1.1 appeared in 1005–5–5.

*and the like. Erwin received no such notice and has not been misled.*

902 F.2d at 512–513 (emphasis added).

■ This Court agrees with the Seventh Circuit and finds that the legislative history, specifically Senate Judiciary Committee Report No. 97–476, establishes that the last clause of § 921(a)(20) was intended to deal with misleading omissions in pardons, notices of expungement, and restoration of rights certificates. Here, as in *Erwin,* the state sent no document restoring Hammonds' civil rights. Thus, there was no potential for deception and Hammonds was in no way misled to believe that his right to own a firearm had been restored.

2. *The Restoration of the Rights to Vote, to Seek and Hold Public Office, and to Serve on a Jury are Based on Considerations Wholly Unrelated to Fitness to Own a Firearm, and Therefore, Restoration of These Rights Does Not Automatically Restore Firearms Privileges.*

The *Cassidy* court further found, through its analysis of Senate Judiciary Committee Report No. 97–476 that "Congress did not intend that a 'convicted felon' be restored to federal firearms privileges *if the restoration [of civil rights] was based upon considerations not relating to fitness to own a firearm.*" 899 F.2d at 548. Nonetheless, without determining whether restoration of the rights to vote, to seek or hold public office or to serve on a jury had any relation to fitness to own a firearm, the court concluded that if, under state law, these "benevolent" rights have been restored, then the convicted felon's rights to own a firearm restored automatically restored, as well.[12]

It is clear to this Court that restoration of the benevolent rights to vote, to seek or hold public office, and to serve on a jury is based upon considerations wholly *un* related to the fitness of a convicted felon to own or possess a firearm.

Although it does not appear that any court has enunciated what considerations underlie the restoration of an ex-felon's rights to vote, several legal treatise writers have discussed the policy considerations underlying restoration of the right to vote. *See, generally,* Gobert and Cohen, *Rights of Prisoners,* § 10.05, p. 307; Vile, *The Right to Vote as Applied to Ex–Felons,* 45 Fed. Probation 12 (1981); Special Project: *The Collateral Consequences of a Criminal Conviction,* Vanderbilt L.R. 929 (1970). These treatises and articles posit that underlying the restoration to ex-felons of their right to vote is to "increase [the ex-felon's] sense of inclusion within the community and foster rehabilitation." Gobert and Cohen, *Rights of Prisoners, supra. See also,* Vile, *The Right to Vote as Applied to Ex–Felons, supra,* ("[T]he act of voting serves as 'one positive act in the rehabilitative process'" because it strengthens his ties to the community and increases his desire to keep abreast of current affairs.) Clearly, these considerations are unrelated to the ex-felon's fitness to own firearms.

With respect to the considerations underlying restoring an ex-felon's right to seek and hold public office, the court in *People ex. rel. Symonds v. Gualano,* 124 Ill. App.2d 208, 219, 260 N.E.2d 284 (1970), found that the policy reasons underlying restoration of this right were to provide a

---

12. The Court would note that one Judge of this Bench has held that in Michigan a convicted felon's rights have not been restored sufficient to trigger the exemption in § 921(a)(20) because convicted felons, although "qualified" to serve on a jury once they have completed their sentence under Michigan statutory law, M.C.L. § 600.1307a(1)(e), Michigan decisional law, in accordance with the Michigan Court Rules, makes them subject to mandatory discharge upon challenge. Thus, the court held that the right to serve on a jury has not been restored,

and, therefore, there had not been a restoration of rights under § 921(a)(20). *United States v. Butler,* No. 91–80729–01, 1991 WL 329604 (E.D.Mich.1991), 12/18/91 Order.

This Court does not rest its decision in this case on the distinction found in *Butler,* but this Court would note that this is the kind of impossible distinction drawing invited by an interpretation of § 921(a)(20) which establishes no requirement of a nexus between the restoration of benevolent rights (such as jury service) and fitness to own or possess a firearm.

"means of encouraging ex-convicts to become upstanding citizens of the community to prove [to the electorate] that they were worthy of public confidence." As with the restoration of the right to vote, these considerations have nothing to do with the fitness to own firearms.

The policy considerations underlying an ex-felon's restoration of his right to serve on a jury is detailed in the Vanderbilt Law Review's Special Project: *The Collateral Consequences of a Criminal Conviction, supra.* According to that detailed study the policy underlying the restoration of the right to serve on a jury is to foster the rehabilitative process and help restore an ex-felon's confidence in the judicial system. *Id.* at 1183. Again, these considerations wholly unrelated to the fitness to own firearms.

■■■ In sum, in determining that a "restoration of civil rights" as contemplated by the legislators in enacting the 1986 amendments to § 921(a)(20), *Cassidy* and other decisions attempting to apply that case, such as *Dahms* and *Gilliam*, did not consider the fact that the restoration of the right to vote, the right to seek and hold public office, and the right to serve on a jury involved considerations wholly unrelated to the fitness to own firearms. Because Congress' clearly expressed intention, as acknowledged by the *Cassidy* court, was that a convicted felon not be restored his firearms privileges if the restoration of his civil rights was not based upon considerations relating to his fitness to own firearms, that intent must be given effect. *See, INS v. Cardoza–Fonseca,* 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987) (directing courts to look to the legislative history to determine whether there is a clearly expressed legislative intention contrary to the language in a statute). *See also, Fort Stewart Schools v. Federal Labor Relations Authority,* 495 U.S. 641, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990) (Scalia, J.) ("the court ... must give effect to the unambiguously stated intent of Congress.")

3. *The Legislative History Establishes that in Enacting the 1986 Amendments to § 921(a)(20), Congress Intended that "Restoration of Civil Rights" as Used in that Section of the Federal Firearms Statute to Be a "Full" Restoration of Rights.*

(a) It Was Not Congress' Intent that an "Automatic" Restoration of Rights, Without Some Affirmative State Action, Should Operate to Exempt Convicted Felons from the Federal Felon–in–Possession Statute.

The legislative history of the Firearms Owners Protection Act of 1986, of which Section 921(a)(20) is a part—from the initial introduction of the first House and Senate bills in the fall of 1979 by the FOPA's co-authors and co-sponsors, Senator McClure and Representative Volkmer, to its eventual adoption in 1986—makes it clear that Congress never intended that an automatic restoration of certain benevolent rights, should, without more, be sufficient to except a prior convicted felon from the federal felon-in-possession statute.

Both Senator McClure and Representative Volkmer explained the proposed amendment of Section 921(a)(20) at issue here in their introductory statements on the floors of the Senate and the House of Representatives introducing Senate Bill S. 1862 and House Bill H.R. 5225—which companion bills formed the genesis of the 1986 FOPA:

> *Prohibiting possession of firearms by persons whose past history indicates a predisposition to use them is only common sense: however, this objective can be achieved without similarly disabling other persons who were convicted of an offense that did not threaten the physical safety of others.* Once these persons [i.e., "other persons who were convicted of an offense that did not threaten the physical safety of others"] have "paid their debt to society" and are presumably rehabilitated, there is no real reason why they should be prohibited from hunting or other legitimate uses of firearms.

125 CONG.REC. 27382 (daily ed. Oct. 5, 1979) (Statement of Sen. McClure introduc-

ing S. 1862); 125 CONG.REC. 23824 (daily ed. Sept. 10, 1979) (Statement of Rep. Volkmer introducing H.R. 5225).

This explanatory statement by the original sponsors of the legislation makes it abundantly clear that from the inception of the amendatory legislation concerning the definition in Section 921(a)(20), it was not the intent of Congress to allow a felon's "automatic" restoration of rights operate to allow him to possess firearms under the federal statute. Rather, this history makes it clear that the legislators viewed it as "common sensical" to keep firearms out of the hands of persons "whose past history indicates a predisposition to use them", but that "other persons who were convicted of an offense that did not threaten the physical safety of others" should not be prohibited from possessing firearms once "they paid their debt to society". In this Court's view, there is no question that those legislators involved in the introduction, drafting, and passage of this provision contemplated all along that some affirmative determination would be made by some state official regarding the convicted felon's fitness to own a firearm.

This view is confirmed by the explanation given by the Senate Judiciary Committee regarding Senate Bill S. 1030. S. 1030 and its companion House Bill, H.R. 3300, which were introduced by Senator McClure and Representative Volkmer in April of 1981, were the "successors" to the 1979 bills, S. 1862 and H.R. 5225.

In explaining the addition in S. 1030 of the phrase *"unless such pardon, expungement, or restoration of civil rights expressly provided that the person may not ship, transport, possess, or receive firearms"* to the end of the proposed amendment to the definition of a convicted felon in Section 921(a)(20), the Judiciary Committee stated:

> The original language of S. 1030 provided that a person barred from gun ownership by a conviction would be relieved from that bar if he received a pardon or

restoration of civil rights. The amended bill adds the exception that this will not apply if the pardon or restoration expressly provides that the recipient may not own firearms. *This allows flexibility should such a pardon or restoration be based upon considerations not relating to fitness to own a firearm.*

\* \* \* \* \* \*

S. 1030 works two changes to this subsection. The first is a recognition that what constitutes a conviction shall be determined in accord with the law of the jurisdiction where the underlying proceedings were held. This is intended to accommodate state reforms adopted since 1968, which permit dismissal of charges after a plea and successful completion of a probationary period, or which create 'open-ended' offenses, a conviction for which may be treated as a misdemeanor or felony at the option of the court. Since the federal prohibition is keyed to the state's conviction, state law should govern these matters. In the case of 'open-ended' offenses which are classed as felonies but may be reduced by the trial court, it is intended that these constitute a 'crime punishable by imprisonment for a term exceeding one year' unless and until the court enters a decision to treat the offense as a misdemeanor.

S. 1030 would also exclude from such convictions any *for which the person has received a pardon, civil rights restoration or expungement of the record.* Existing law incorporates a similar provision as to pardons in 18 U.S.C. section 1202, relating to possession of firearms,[13] but through oversight does not include such provision in 18 U.S.C. section 922, dealing with their purchase or receipt. This oversight has resulted in a ruling that a state pardon does not permit a pardoned citizen to receive or purchase a firearm, despite the express provision that he may possess it.... This change would remove that anomaly. *In the*

---

**13.** Under the FOPA amendments, section 922 incorporated the provisions of previous section 1202.

*event that the official granting the pardon, restoration of rights or expungement of record does not desire it to restore the right to firearm ownership, this provision is rendered inapplicable where the order or pardon expressly provides that the person may not possess firearms.*

S.Rep. No. 97–476, 97th Cong., 2d Sess. (1982).

The post-FOPA enactment statement of Minnesota Senator Durenberger cited in *Cassidy,* far from contradicting this interpretation, further supports this Court's view that it was *not* the intention of Congress that an "automatic" restoration of benevolent of citizenship, without some affirmative state action, operate to restore a convicted felon's right to possess firearms for purposes of the federal firearms statutes. Senator Durenberger stated:

> In the State of Minnesota, a convicted felon's civil rights are automatically restored when his sentence expires. Therefore, under the new federal law, it will no longer be a violation of the Federal Gun Control Act of 1968 for a Minnesotan convicted of a felony to possess a firearm after his sentence has expired. The same will be true in each State which automatically restores a convicted felon's civil rights. *This creates a problem in my State. The ironic, unintended side effect of this "glitch in the gun law" is to turn a law intended to crack down on crime into a law that could abet crime unless Minnesota changes its law regarding the civil rights of felons....*

132 CONG.REC. S14,974.[14]

■ Based upon the legislative history cited above, this Court believes that it was *not* the legislature's intent that an "automatic" restoration of benevolent rights of citizenship, without some affirmative state action determining fitness to own firearms

should operate to exempt a convicted felon from the federal firearms statutes.

(b) Congress Intended "Restoration of Civil Rights" to Mean a "Full" Restoration of Rights.

Having construed the legislative history and Congressional intent as indicated above as not equating the automatic restoration of benevolent rights with the restoration of the right of all convicted felons to possess a firearm, it is not necessary to a determination of this case to reach the issue of whether Congress intended the "restoration of civil rights" language of § 921(a)(20) to require a "full" restoration of rights. However, this Court does believe that Congress did intend that only a full and complete restoration of rights, coupled with some state action affirmatively granting a convicted felon the right to own or possess a firearm, is exactly what Congress contemplated.

As the *Cassidy* court correctly observed, there is nothing in the legislative history identifying the specific rights that must be restored by a state in order for it to have effected a "restoration of civil rights" for purposes of § 921(a)(20). The government argued in *Cassidy* that "restoration of civil rights" in § 921(a)(20) was intended to mean a "full" restoration of all rights and privileges. The Sixth Circuit, however, rejected that construction, "We do not read into the statutory language, however, a requirement that there be a "full" restoration of rights." 899 F.2d at 549.

Having reviewed the full legislative history of the 1986 legislation, however, this Court finds that Congress *did,* in fact, intend the "pardon/expungement/restoration of civil rights" to mean a "full" pardon, "full" expungement and "full" restoration of rights. Statements made by a number of the co-sponsors of Senate Bill S. 49—which was the bill that ultimately was en-

**14.** The Court would note that, inasmuch as Senator Durenberger's statement is a *post*-FOPA enactment statement, it is not technically part of the legislative history of the 1986 Firearms Owners Protection Act amendments. But, it does indicate that the legislators did not intend that an "automatic" restoration of undefined rights, without more, would operate to exempt convicted felons from the federal firearms statutes. That it was not the intent of at least Senator Durenberger is evident, for Senator Durenberger had voted *in favor* of Senate Bill S. 49.

acted—during the floor debates on that bill clearly demonstrate this intent.[15]

For example, Senator Orin Hatch, one of the co-sponsors of the 1986 legislation who was designated as the floor manager of Senate Bill S. 49, in his section-by-section analysis of the bill explained that one of the purposes of the bill was to override certain federal court decisions and to lift the bar imposed by those decisions against persons from possessing firearms "who have had their records expunged, who have been pardoned, or *who have had their full civil rights restored* pursuant to State law." 131 CONG.REC. S 8699.[16]

■ In this Court's opinion, a "full" restoration would encompass the right to vote, to seek and hold public office, to serve on a jury, to be eligible for all state public service employment (such as state police), to be licensed by the various licensing authorities which govern particular private sector occupations, and the like, *and* a full restoration of his rights to possess any kind of firearm. It is undisputed that not all of these rights have been restored to Defendant Hammonds.

**15.** The Court notes that the *Cassidy* decision does not reflect that the floor debates were considered by the Sixth Circuit in its analysis of the legislative history.

**16.** *See also,* the statement of Senator Baucus, another of the bill's co-sponsors, at 131 CONG. REC. S 8700, who stated that one of the "oversights" that the Firearms Owners Protection Act would correct would be to lift the "felon's stigma" from persons who have received a *full* pardon.

**17.** *See* M.C.L. § 168.758b and Michigan Constitution of 1963, art. 2, § 2 (prohibiting convicts from voting only *while they are incarcerated*); M.C.L. § 168.938 and 1955–56 Op.Mich.Atty. Gen. No. 2393, p. 708 (calling for the removal of a candidate or public office holder only if he is convicted of a felony *during his candidacy or term of office*); M.C.L. § 600.1307a (disqualifying from jury service persons who are *under a sentence for a felony at the time of jury selection*.)

**18.** *See, United States v. Breckenridge,* 899 F.2d 540 (6th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 119, 112 L.Ed.2d 88 (1990) (New Jersey law); *United States v. McLean,* 904 F.2d 216 (4th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990) (North Carolina law); *United States v. Gomez,* 911 F.2d 219 (9th Cir.1990) (Idaho law); *United States v.*

The Court acknowledges that by operation of Michigan law, Hammonds' rights to vote, to seek and hold public office, and, arguably, to serve on a jury have all been restored to him.[17] The Court further acknowledges that several circuits since 1990 have followed the *Cassidy* court's holding that "unless there is some expressly stated preclusion of firearms possession, the restoration of the right to vote, to seek and hold public office, and to serve on a jury operates to automatically restore firearms privileges".[18] However, nothing in those cases indicates that those courts independently reviewed the legislative history of the 1986 legislation or that they considered the effect of considerations underlying the restoration of the rights to vote, to seek and hold public office, and to serve on a jury, and the relationship of those considerations to the fitness to own firearms. Thus, to the extent that Defendant Hammonds relies upon the Ninth Circuit's application of *Cassidy* in *United States v. Dahms,* 938 F.2d 131 (9th Cir.1991), this Court finds *Dahms* unpersuasive.[19]

*Dahms,* 938 F.2d 131 (9th Cir.1991) (Michigan law); *United States v. Burns,* 934 F.2d 1157 (10th Cir.1991) (Kansas law), *cert. denied,* — U.S. ——, 112 S.Ct. 1246, 117 L.Ed.2d 478 (1992); *United States v. Swanson,* 753 F.Supp. 338 (N.D.Ala.1990), *aff'd,* 947 F.2d 914 (11th Cir.1991); *United States v. Ziegenhagen,* 776 F.Supp. 441 (W.D.Wis.1991); *United States v. Gilliam,* 778 F.Supp. 935 (E.D.Mich.1991).

**19.** With respect to the central *Dahms* argument, i.e., whether a convicted felon's right to possess a firearm is not restored by virtue of the Michigan handgun licensing statute, M.C.L. § 28.422, this Court does agree with the Ninth Circuit that long arms—such as the rifle at issue in this case—are not covered by that statute.

The Court notes that *Dahms* involved a prior version of M.C.L. § 28.422 which precluded ex-felons from obtaining a handgun license during the eight years following his conviction or incarceration. That statute was amended effective March 28, 1990 and the eight year prohibition was eliminated and in its place, the statute now incorporates the language of 18 U.S.C. § 921(a)(20). The handgun licensing statute now provides that as a requirement for obtaining a license to purchase, carry or transport a pistol that

[t]he person has not been convicted of a crime punishable by imprisonment for more

## V. CONCLUSION

 Having reviewed the legislative history of the 1986 amendments of 18 U.S.C. § 921(a)(20), this Court finds that it was the expressly stated intent of Congress:

(1) that "restoration of civil rights" as used in § 921(a)(20) would mean a "full" restoration of rights,

(2) that if the "restoration of civil rights" was based on considerations unrelated to the fitness to own a firearm, that restoration of civil rights would not operate to exempt a prior convicted felon from the federal firearms felon-in-possession statute, and

(3) that the second sentence of § 921(a)(20)—i.e., the provision that "any conviction that has been expunged, or set aside or for which a person has been pardoned or has had his civil rights restored shall not be considered a conviction for purposes of this chapter unless such pardon, expungement or restoration of civil rights expressly provides that the person may not ship, transport, possess or receive firearms"—only becomes operational in cases where the defendant has been issued a written document by a state official, or where there has been some other "affirmative" action by state authorities.

It being undisputed that no written document evidencing a full restoration of Deondre Hammonds' civil rights was ever issued nor was any other "affirmative" action taken by any state official, and the Court having determined that the restoration of Hammonds' rights to vote, to seek and hold public office, and to serve on a jury was based on considerations unrelated to fitness to own a firearm, and for all of the reasons set forth in this Opinion and Order, the Court has determined that Defendant Deondre Hammonds' Motion to Dismiss his one-count felon-in-possession indictment must be denied.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Deondre Hammonds' Motion to Dismiss Indictment be, and hereby is, DENIED.

---

than 1 year. This subdivision does not apply to a conviction that has been expunged or set aside, or for which the person has been pardoned or has had his or her civil rights restored unless the expungement, order, or pardon expressly provides that the person shall not ship, transport, possess or receive firearms.

M.C.L. § 28.422(3)(c).